IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 25, 2015


**DAVID ANTHONY LAJENISS v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Sullivan County**
**No. C60,687     Robert H. Montgomery, Jr., Judge**

_____


**No. E2014-01434-CCA-R3-PC – Filed July 7, 2015**

_____



David Anthony Lajeniss ("the Petitioner") filed a petition for post-conviction relief claiming that he received ineffective assistance of counsel and that his guilty plea was involuntary and unknowing. After a hearing, the post-conviction court denied relief. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, and NORMA MCGEE OGLE, JJ., joined.

C. Brad Sproles, Kingsport, Tennessee, for the Appellant, David Anthony LaJeniss.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Barry Staubus, District Attorney General; and William Harper, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

### *Guilty Plea Proceedings*

The Sullivan County Grand Jury indicted the Petitioner with one count of attempted first degree murder and two counts of aggravated assault.[1] The Petitioner pleaded guilty to both counts of aggravated assault, which were merged. Pursuant to a plea agreement, the Petitioner was sentenced out of range to twelve years' incarceration with a 30% release eligibility. The attempted first degree murder charge was dismissed.

During the plea colloquy, the trial court explained that a Range I sentence for aggravated assault normally carried three to six years and a Range III sentence normally carried ten to fifteen years. The Petitioner affirmed that he understood the charges against him, their respective ranges of punishment, and that he was not a Range III offender. Additionally, the following exchange took place:

> THE COURT: Now, I'm sure your attorney also explained to you that if you went to trial on this attempt to commit first-degree murder that that's a Class A felony and it carries 15 to 25 years and so it would appear probably what you're doing is agreeing to a longer sentence but at a lower percentage. Is that what you're doing as part of your plea agreement in this case?
>
> [THE PETITIONER]: Yes, sir.
>
> THE COURT: Now do you have any questions about that?
>
> [THE PETITIONER]: No, sir, I just wanted to ask if you could file for immediate transfer.

The trial court informed the Petitioner of his rights to a trial by jury, to have representation during a trial, to be present at the trial, to cross-examine witnesses, to maintain his innocence, to call his own witnesses, to remain silent, and to appeal. The Petitioner affirmed that he understood these rights and that he knowingly and voluntarily gave them up in exchange for the plea agreement. The Petitioner denied being forced, threatened, coerced, intimidated, or pressured into accepting the plea agreement. He also stated that he was not under the influence of any drug or narcotic.

---

[1] It appears that the Petitioner was also indicted on a fourth count. However, because the indictment is not included in the record on appeal, we must glean the Petitioner's charges from the transcript of the guilty plea proceedings.

The State made the following offer of proof:

> [O]n July the 7[th], 2010[,] officers with the Kingsport Police Department were called to 1501 Waverly Road in Kingsport, Sullivan County. When they arrived there they found the victim in this case whose name was Lloyd Allen McDavid who had been beaten and assaulted by three individuals, Mr. Troy Bartley, Mr. Andrew Goldbach, and [the Petitioner]. The State's proof would be that, on that evening Mr. McDavid was walking in the area of the Waverly Road near the back of the laundry mat when he ran into those three individuals who produced an axe handle as well as a knife and began threatening Mr. McDavid calling him a snitch. Evidently Mr. Bartley had learned that Mr. McDavid had been cooperating with the Kingsport Vice Unit and the three of those individuals then began attacking Mr. McDavid hitting him several times in the head, kicking him in the body. As a result of this assault Mr. McDavid was taken to Holston Valley Hospital where he was treated for various injuries including a broken left arm . . . .

Before entering his plea, the Petitioner confirmed his satisfaction with the representation of trial counsel. After accepting the Petitioner's plea, the trial court merged both counts of aggravated assault and sentenced the Petitioner to twelve years' incarceration with a Range I 30% release eligibility.

*Post-Conviction Proceedings*

The Petitioner filed a petition for post-conviction relief claiming he received ineffective assistance of counsel when trial counsel failed to, among other things: (1) properly advise the Petitioner about the possibility of his co-defendants' testifying against him at trial; (2) obtain forensic tests of the weapons used in the commission of the offense; (3) interview or subpoena possible defense witnesses; (4) investigate the victim's level of intoxication at the time of the offense; (5) obtain a recorded conversation with the victim that could have been used to impeach the victim's testimony; and (6) advise the Petitioner that he could have filed a motion to withdraw his guilty plea within thirty days of its entry. Additionally, the Petitioner claimed that his guilty plea was involuntarily and unknowing.

At the post-conviction hearing, the Petitioner testified that trial counsel was ineffective for failing to "properly" advise him about the possibility that his co-defendants, Troy Bartley and Andrew Goldbach, could testify against him at trial. Trial counsel told the Petitioner that his co-defendants may testify against him. However, the Petitioner claimed that Mr. Goldbach was actually deceased at the time the Petitioner entered his guilty plea. Had the Petitioner known of Mr. Goldbach's death, he would have rejected the plea and proceeded to trial.

- 3 -

The Petitioner also claimed that trial counsel was ineffective for failing to investigate the victim's level of intoxication at the time of the offense. The Petitioner noted that a drug screen was requested for the victim. However, the Petitioner believed that the Kingsport Police Department ("KPD") vice unit cancelled the screen before it was performed. The Petitioner stated that he discussed the cancelled drug screen with trial counsel. The Petitioner averred that, had the test been performed, it would have shown that the victim was under the influence of drugs and alcohol on the day of the offense. The Petitioner stated that such evidence would have helped his defense and shown that the victim lied during the preliminary hearing. Additionally, the Petitioner explained that trial counsel's failure to investigate the victim's drug use on the day of the offense made the Petitioner feel that he "had no way of providing a reasonable defense." Consequently, the Petitioner accepted the plea deal.

The Petitioner averred that trial counsel should have obtained forensic testing of the knife and axe handle that were used in the offense. The Petitioner explained that those weapons were in the State's custody and were never tested for physical evidence such as blood or fingerprints. The Petitioner told trial counsel that he wanted the weapons to be tested, but trial counsel informed him that the trial court likely would not grant a request for tests. The Petitioner claimed that had the knife been tested, the results would have shown that any blood on the knife was the Petitioner's, not the victim's. Additionally, forensic testing of the axe handle would have shown fingerprints from two individuals on the handle, not three. The Petitioner explained that he and Mr. Bartley had both held the axe handle a couple of days before the offense. The Petitioner claimed that forensic tests showing only two fingerprints on the axe handle would contradict the victim's claim that all three co-defendants had used the axe handle to beat him. The Petitioner claimed that had the forensic testing been performed, he would have proceeded to trial instead of accepting a guilty plea.

The Petitioner claimed that trial counsel was ineffective for failing to subpoena Emily Gibson. Ms. Gibson was the mother of the Petitioner's daughter. Earlier on the day of the offense, the Petitioner accompanied Ms. Gibson to the hospital to find out if she was pregnant. The Petitioner claimed that, had Ms. Gibson been subpoenaed and testified about the Petitioner's activities during the day of the offense, her testimony would have shown that the Petitioner had not planned to kill the victim, thereby undermining the attempted first degree murder charge. The Petitioner told trial counsel about Ms. Gibson. The Petitioner believed that trial counsel may have spoken with Ms. Gibson on the phone, but trial counsel did not subpoena Ms. Gibson. Prior to the scheduled trial date, Ms. Gibson disappeared. The Petitioner stated that, had she been under subpoena and available to testify at trial, he would not have entered a guilty plea and would have proceeded to trial.

The Petitioner also claimed that trial counsel failed to investigate allegations that the victim had threatened Ms. Gibson in order to prevent her from testifying. According

to the Petitioner, the victim contacted Ms. Gibson and said, "You need to stop talking about the case and [] if you don't then I'm going to put you away, I'm going to make sure your kids get taken by social services." Several people, including the Petitioner's mother, heard the threat. Shortly after the threat, Ms. Gibson disappeared. The Petitioner informed trial counsel of the threat, but the Petitioner did not know whether trial counsel tried to contact Ms. Gibson to discuss the threat before she disappeared.

The Petitioner asserted that trial counsel was ineffective for failing to investigate or call witnesses to impeach the victim's testimony that the Petitioner and his co-defendants knew that the victim was a confidential informant for KPD. The Petitioner stated that Kathy Smith was on the scene at the time of the offense, and she would have testified that the Petitioner and his co-defendants were not waiting for the victim and "brandishing weapons" as the victim claimed. The Petitioner asked trial counsel to interview Ms. Smith and to subpoena her. However, trial counsel failed to do either because he could not find Ms. Smith.

The Petitioner also claimed that trial counsel failed to investigate witnesses who reported seeing the victim days after the preliminary hearing showing no signs of injury. Ms. Gibson and Ms. Smith saw the victim playing with children. He had a sling on his arm but was moving his arm in a way that it appeared his arm was not hurt. According to the Petitioner, the victim had testified at the preliminary hearing that he could not move his arm. The Petitioner told trial counsel about this encounter, but trial counsel did not investigate the issue further.

The Petitioner also claimed that trial counsel was ineffective for failing to investigate exculpatory statements the victim made, which were recorded by Ms. Gibson and Ms. Smith. Ms. Gibson told the Petitioner that she had a recording of the victim telling Ms. Smith that the Kingsport district attorney and KPD vice unit told him to "say and do everything to put [the Petitioner and his co-defendants] away for a long time." The Petitioner asked trial counsel to obtain a copy of the recording, but trial counsel told him the recording was probably inadmissible. The Petitioner thought trial counsel may have tried to meet with Ms. Gibson to listen to the recording, but the Petitioner was not sure whether that meeting occurred. The Petitioner stated that he never received a copy of the recording. He stated that he would have proceeded to trial had he received a copy of the recording.

The Petitioner called trial counsel four or five days after entering his guilty plea and told trial counsel that he wanted to withdraw his plea. Trial counsel informed him that there was nothing else the Petitioner could do after his guilty plea had been entered. When the Petitioner was transported to prison, other inmates informed him that he could have withdrawn his guilty plea within thirty days. The Petitioner stated that, had he known he could withdraw his plea, he would have done so and proceeded to trial.

The Petitioner recalled that trial counsel did not request a continuance to allow time for more investigation prior to the Petitioner's entering the guilty plea. The Petitioner had asked trial counsel to request a continuance because the Petitioner was not prepared to go to trial. However, trial counsel told the Petitioner that the district attorney would not agree to a new trial date and did not move for a continuance. Consequently, the Petitioner signed the guilty plea.

Although the Petitioner could not recall who told him that Mr. Goldbach had died, he agreed that neither the State's attorney nor trial counsel gave him that information. The Petitioner also admitted that he had no proof that the KPD vice unit had cancelled the victim's drug screen. Instead, he explained that "the word on the street" was that the KPD vice unit had suppressed the evidence.

The Petitioner agreed that trial counsel had met with Ms. Gibson once to talk to her about testifying on behalf of the Petitioner. He also agreed that trial counsel attempted to contact Ms. Gibson and locate her after she disappeared.

The Petitioner also admitted that he had asked trial counsel to try to negotiate a plea that would allow the Petitioner to serve three years in custody and three years on probation. Trial counsel brought the offer to the State, but it was rejected. Later, trial counsel informed the Petitioner that the State was offering a twelve-year sentence. Trial counsel also explained that, although the Petitioner was not a Range III offender, he could accept the out-of-range plea agreement to avoid the attempted first degree murder charge. The Petitioner also confirmed that he told the trial court during the plea colloquy that he was entering his plea voluntarily and that he had not been coerced in any way. The Petitioner explained that he wanted to withdraw his guilty plea because he wanted to get a better sentence.

On redirect examination, the Petitioner stated that, at the time of his guilty plea, he did not have a clear understanding of whether his co-defendants would have testified against him. The Petitioner had heard a rumor that Mr. Bartley was going to testify on behalf of the State, and he did not want to proceed to trial in light of that knowledge. The State informed the post-conviction court that, at the time of the Petitioner's guilty plea, Mr. Bartley had already pleaded guilty and was available to testify against the Petitioner. However, the charges against Mr. Goldbach were still pending. The charges against Mr. Goldbach were ultimately dismissed because he died before the case was resolved. However, Mr. Goldbach's death occurred almost a year after the Petitioner pleaded guilty.

In response to questions from the post-conviction court, the Petitioner admitted that, at the time he entered his plea, he knew he could not have been sentenced to twelve years for the aggravated assault charge had he been sentenced after a trial. However, the Petitioner also acknowledged that, had he gone to trial, he could have been convicted of attempted first degree murder.

Elana Hartman, the Petitioner's mother, testified that she spoke with trial counsel one time during the pendency of the Petitioner's case. She and Ms. Gibson called trial counsel to inform him that Ms. Gibson had a recording of the victim speaking with Ms. Smith. Ms. Hartman had listened to the recording and could hear the voices of the victim and Ms. Smith. In that recording, Ms. Smith commented that the victim looked very well for having recently been in the hospital, and the victim replied, "Well, I wasn't hurt as bad as what it was made out to be." The victim stated that his arm was in a brace, but he had no other injuries. The victim also told Ms. Smith that he was working with the authorities and that the charges against the Petitioner and his co-defendants were a "setup." Ms. Hartman and Ms. Gibson played the recording over the phone so that trial counsel could hear it, but Ms. Hartman did not hear trial counsel's response.

Shortly after Ms. Gibson played the recording for trial counsel, Ms. Hartman received a call from a blocked number. A male voice on the other end of the line told her that she "needed to get [her] daughter-in-law to stop playing that recording, that somebody could get hurt[,] and that they knew she had a daughter." Ms. Hartman stated that the phone call scared her to the point that she was crying and shaking. A few days later, Ms. Hartman received another phone call from a person who told her that he knew Ms. Hartman had Ms. Gibson's child and that "people can get hurt."

Ms. Hartman confirmed that Ms. Gibson had disappeared for a period of time and no one was able to find her. During that time, Ms. Gibson's daughter lived with Ms. Hartman.

Trial counsel testified that, throughout the case, the Petitioner's primary concern was that he did not want to plead guilty to the attempted first degree murder charge. Therefore, trial counsel tried to negotiate a plea agreement that would allow the Petitioner to plead guilty to the aggravated assault charges. Initially, the State was resistant to dropping the attempted first degree murder charge, but once Mr. Bartley pleaded guilty, the State was more open to negotiation with the Petitioner. Trial counsel recalled that, at the time the Petitioner pleaded guilty, Mr. Goldbach was still alive and that the charges against him were still pending.

Trial counsel described the Petitioner as a "very . . . involved client" and reported that he had discussed the case with the Petitioner "dozens and dozens of times" throughout his representation. Trial counsel recalled that the Petitioner seemed to understand the plea agreement and that he was pleading out-of-range. Although the Petitioner wanted to negotiate a plea agreement with a six-year sentence, trial counsel explained that he could not force the State to accept the Petitioner's counteroffer and that it appeared that twelve years was the best sentence the State was going to offer. The Petitioner ultimately agreed to accept the State's offer when trial counsel explained that the Petitioner could face the attempted first degree murder charge if he went to trial.

Trial counsel reported that he spoke with Ms. Gibson several times and was considering calling her as a witness. Trial counsel also recalled Ms. Gibson playing a recording for him, and he instructed her to bring the recording to his office. However, Ms. Gibson never brought him the recording. She disappeared, and even though trial counsel tried to reach her several times, he was unable to find her. Trial counsel also tried to located Ms. Smith, with no success. Trial counsel explained that both Ms. Gibson and Ms. Smith could have been called as witnesses, but their testimony would have been very limited because they did not witness the incident.

The Petitioner called trial counsel shortly after he entered his guilty plea to discuss the possibility of withdrawing his plea. Trial counsel thought the Petitioner simply had "buyer's remorse" about his plea agreement and wanted a better sentence. Trial counsel explained that there were limited grounds for withdrawing a guilty plea and that dissatisfaction with his sentence was not a legitimate ground. Trial counsel did not file a motion to withdraw the guilty plea.

On cross-examination, trial counsel stated that he had looked into the victim's intoxication level at the time of the offense, but he could not recall whether the victim's medical records indicated whether the victim underwent a drug screen.

Trial counsel explained that he did not request forensic testing of the axe handle because there was good reason to believe that the Petitioner's fingerprints would have been found there. Additionally, the Petitioner's trial strategy was to say that he used the axe handle in self-defense, so trial counsel did not believe fingerprint analysis would have been useful.

In a detailed written order, the post-conviction court denied relief. The post-conviction court noted that the Petitioner never indicated during the plea colloquy that he did not understand the nature or the consequences of his plea or that his plea was not knowingly or voluntarily given. The record reflected that the Petitioner was an active participant in the plea negotiations and that he accepted the out-of-range plea to avoid trial on the attempted first degree murder charge. Additionally, the post-conviction court found that the Petitioner had failed to show that trial counsel was deficient or that he was prejudiced by any deficiency. In doing so, the post-conviction court expressly credited trial counsel's testimony.

## Analysis

On appeal, the Petitioner claims trial counsel was ineffective for failing to: (1) inform him that his co-defendant had passed away and would not be available to testify against him at trial; (2) subpoena possible defense witnesses; (3) investigate the victim's level of intoxication at the time of the offense; (4) obtain a copy of the recorded conversation between the victim and Ms. Smith; (5) obtain forensic tests of the knife and axe handle; and (6) inform the Petitioner that he could have withdrawn his plea within

thirty days. Additionally, the Petitioner claims that his plea was involuntary and unknowing.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. Id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law are reviewed "under a purely *de novo* standard, with no presumption of correctness . . . ." Id.

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." Id. at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." Id. (citing Henley, 960 S.W.2d at 579).

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under

prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Ct. Crim. App. Apr. 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. See Hill, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." Id. at 59.

In this case, the Petitioner argues that trial counsel was ineffective for failing to inform him that his co-defendant, Mr. Goldbach, had passed away and would not have been available to testify against the Petitioner at trial. However, the record reflects that Mr. Goldbach did not pass away until after the Petitioner had entered his guilty plea. Additionally, the Petitioner testified that he knew his other co-defendant, Mr. Bartley, could testify against him and that he did not want to proceed to trial in light of that information. The Petitioner is not entitled to relief based upon this allegation.

Second, the Petitioner contends that trial counsel was ineffective for failing to subpoena possible defense witnesses. On appeal, the Petitioner does not identify which witnesses should have been subpoenaed, but we presume he means Ms. Gibson and Ms. Smith. Trial counsel testified that he tried to get in touch with both Ms. Gibson and Ms. Smith but he was unable to find them. Additionally, it is well-settled law that, to succeed on a claim of ineffective assistance of counsel for failure to subpoena a witness for trial, a post-conviction petitioner should present that witness at the post-conviction hearing. Plyant v. State, 263 S.W.3d 854, 869 (Tenn. 2008); see also Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Neither Ms. Gibson nor Ms. Smith testified at the post-conviction hearing. Therefore, the Petitioner has failed to show that trial counsel was deficient or that he was prejudiced.

Third, the Petitioner contends that trial counsel was ineffective for failing to investigate the victim's intoxication level at the time of the offense. The record shows that the victim did not undergo a drug screen when he was taken to the hospital. Trial

counsel cannot be expected to determine the victim's intoxication level months or years after the victim was alleged to be intoxicated. Therefore, the Petitioner has failed to show that trial counsel was deficient in this regard.

Fourth, the Petitioner avers that trial counsel was ineffective for failing to obtain a copy of the recorded conversation between the victim and Ms. Smith. Trial counsel testified that he asked Ms. Gibson to bring him a copy of the recording but she disappeared before he could obtain a copy. Trial counsel attempted to locate Ms. Gibson without success. In light of these facts, we conclude that the Petitioner has failed to demonstrate any deficient performance on the part of trial counsel.

Fifth, the Petitioner argues that trial counsel was ineffective for failing to obtain forensic tests of the knife and axe handle. The Petitioner freely admitted that his blood and fingerprints would have been found on both weapons. Additionally, trial counsel testified that forensic testing would not have been useful because the Petitioner's defense strategy was that he had used the weapons in self-defense. Accordingly, the Petitioner failed to show deficient performance or prejudice.

Sixth, the Petitioner contends that trial counsel should have advised him that he could have withdrawn his guilty plea within thirty days of its entry. Trial counsel explained to the Petitioner that there were limited grounds by which the Petitioner could withdraw his guilty plea. Tennessee Rule of Criminal Procedure 32(f)(2) states:

> After a sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct a manifest injustice.

Courts have identified certain circumstances when "manifest injustice" warrants withdrawal of a plea, such as:

> (1) the plea was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered, and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

State v. Virgil, 256 S.W.3d 235, 240 (Tenn. Crim. App. 2008). "Buyer's remorse" about the plea agreement does not warrant the withdrawal of a guilty plea. Therefore, the Petitioner has failed to show that trial counsel was deficient in this regard. The Petitioner is not entitled to relief on this issue.

*Involuntary Guilty Plea*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard as announced in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). Don Allen Rodgers, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." Boykin, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e. that he has been made aware of the significant consequences of such a plea . . . ." Mackey, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Boykin, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904; Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. Boykin, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." Id. at 74.

In this case, the Petitioner argues he was unprepared for trial and that trial counsel's failure to request a continuance left the Petitioner feeling that he had no other option than to enter a guilty plea. However, during the plea colloquy, the Petitioner did

not indicate that his plea was involuntary or unknowing. Additionally, trial counsel's testimony at the post-conviction hearing shows that the Petitioner actively participated in the negotiations of his plea and sentence. Trial counsel explained to the Petitioner that he was accepting an out-of-range plea for the aggravated assault charges in order to avoid a trial on the attempted first degree murder charge. The Petitioner indicated that he understood the nature of the plea. As such, we conclude that the Petitioner has failed to prove, by clear and convincing evidence, that his plea was involuntary or unknowing. The Petitioner is not entitled to relief on this issue.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE